822 So.2d 975 (2002)
Rebecca McDonald SMITH, Jimmy Smith, Cynthia S. Nance (Eaton) and Lisa S. Rogers, Appellants,
v.
Mark ORMAN, Administrator, D.N.B.C.T.A., David McDonald, William G. McDonald, Marion Earl Henley, Thelma McDonald Nunnery, Betty Madison Harrison Goodhart, Sam Allen Madison, Patricia Clark and Jane McDonald Brasfield (Abshire), Appellees.
No. 2001-CA-00252-COA.
Court of Appeals of Mississippi.
March 12, 2002.
Rehearing Denied May 21, 2002.
*976 B. Sean Akins, Ripley, attorney for appellants.
Lester F. Sumners, New Albany, Wendell H. Bryan II, Amory, Gerry M Blaker, II, Holly Springs, attorneys for appellees.
Before SOUTHWICK, P.J., LEE, and CHANDLER, JJ.
*977 SOUTHWICK, P.J., For The Court.
¶ 1. Rebecca McDonald Smith, the former executrix of the Fred McDonald estate, and her children appeal the judgment of the chancery court finding Smith and her son misappropriated funds from the estate, assessing monetary damages and fees, and setting aside certain property transfers. Smith and her children argue that the chancellor erred in setting aside a transfer by warranty deed of 500 acres of land from Smith to her daughter, erred in assessing punitive damages, and erred in awarding attorney's fees to counsel for the estate and heirs. We disagree and affirm.

STATEMENT OF FACTS
¶ 2. Fred McDonald died on October 5, 1995. In his will he named his sister Rebecca M. Smith as executrix and waived an accounting. On November 22, 1995, the same day Smith sought the services of an attorney to prepare a petition to open the estate and be granted letters testamentary, Smith sought the services of a different attorney to prepare a warranty deed transferring 500 acres of farmland, all of her real property, to her daughter, Cindy S. Nance. Smith reserved a life estate in the property.
¶ 3. Prior to and after her appointment as executrix on December 5, 1995, Smith applied to her own use certain funds of the estate. These included mutual fund dividend checks in the amount of $5,700, dividends from assorted bank stocks, United States savings bonds in the amount of $13,500, and $20,650 in cash derived from a certificate of deposit. Smith claimed that her brother had told her that she could have these after he died. Smith admits that McDonald never prepared any documents of transfer; she had trusted him to do so. Smith also granted her son, Jimmy, access to estate funds and for two years allowed her son to live in McDonald's house and to use McDonald's truck. Estate funds were used to pay utility bills for the period Jimmy Smith lived in the McDonald house and also for gas, insurance, tags, and maintenance for the truck. Estate funds were used to pay income tax on funds that Smith claimed McDonald gave to her.
¶ 4. On September 19, 1996, Smith executed a "disclaimer" which directed that Smith's share of the estate be deflected to her two daughters, Cynthia Nance and Lisa Rogers.
¶ 5. In 1996, a partial distribution consisting of 2,290 shares of Union Planters stock and $96,000 in cash was made to the heirs of the McDonald estate. One of the heirs, Earl Henley, was dissatisfied with the manner in which the estate was being handled and particularly dissatisfied with the lack of information provided by Smith. After unsuccessful attempts to obtain a voluntary accounting, the heirs filed a petition in April of 1998 seeking to have Smith ordered to file an accounting. In May 1999, an agreed order was entered under which Smith was to submit an accounting in June 1999. Smith failed to comply and a petition for her removal as executrix was filed. She was removed in September 1999. Smith consented to a judgment against her in the amount of $22,165.75, the amount she agrees was improperly applied to personal use.
¶ 6. Smith filed a final accounting in November 1999. The next month the new estate administrator, Mark Orman, petitioned to falsify the final accounting of Smith and to also seek additional recovery from her and her three children. A trial was held on June 23, 2000, and judgment was entered against the defendants. Smith and her children appealed.

DISCUSSION
¶ 7. Smith alleges that the chancellor adopted the administrator's proposed *978 findings of fact and conclusions of law verbatim. "Where the chancellor adopts, verbatim, findings of fact and conclusions of law prepared by a party to the litigation, this Court analyzes such findings with greater care, and the evidence is subjected to heightened scrutiny." Brooks v. Brooks, 652 So.2d 1113, 1118 (Miss.1995).
¶ 8. The record does not contain the proposed findings of fact and conclusions of law with which we might make a comparison to those adopted by the chancellor. The Smiths included a copy of the administrator's proposed findings in their record excerpts, but this is not part of the official court record upon which we may rely. Dew v. Langford, 666 So.2d 739, 746 (Miss. 1995). However, the administrator admits that "much was adopted verbatim." The administrator only points to the changing of one phrase, the addition of one paragraph done "without suggestion by any party," and the doubling of punitive damages from $10,000 to $20,000, as proof that the chancellor's order was not entirely adopted verbatim. Such minor alterations do not affect the rule requiring a heightened level of scrutiny.

1. Punitive Damages
¶ 9. The Smiths do not contest the amount of compensatory damages that the chancellor awarded. However, they do challenge on appeal the chancellor's finding and award of punitive damages due to the alleged misappropriation and conversion of estate assets.
¶ 10. Having acknowledged that conversion occurred, the appellants are arguing that such acts do not justify punitive damages. Punitive damages are awarded when the conduct complained of is "a willful or malicious wrong" or undertaken in "gross, reckless disregard for the rights of others." Boling v. A-1 Detective & Patrol Serv., Inc., 659 So.2d 586, 588 (Miss.1995). That the conduct complained of warrants punitive damages must be proved by clear and convincing evidence. Miss.Code Ann. § 11-1-65(1)(a) (Supp.2001).
¶ 11. The chancellor rejected testimony that Rebecca and Jimmy Smith had no intent to defraud the estate, that Smith's brother Fred McDonald had given Rebecca Smith the funds she asserts were hers, that her original estate attorney, now deceased, advised her such actions would be permissible, and that the failure to keep records or remember certain transactions were without malicious intent. The only witnesses to testify for the estate were Rebecca and Jimmy Smith, Cynthia Nance, and Earl Henly. The first three were called adversely by the estate. The only witnesses for the defendants were Jimmy Smith and Judy Eddings.
¶ 12. One of the bases for reversal is the allegation "that the testimony of a witness which is uncontradicted, and who is not impeached in some manner known to the law, where he is not contradicted by the circumstances, must be accepted as true." Denson v. George, 642 So.2d 909, 914 (Miss.1994). However, Denson continues on stating that "testimony that is uncontroverted may be so improbable and incomplete that, considering the circumstances of the case, the credibility of the testimony is inadequate." Id. Additionally, the assessment of a witness's credibility is left to the chancellor. Dunn v. Dunn, 786 So.2d 1045, 1049 (Miss.2001).
¶ 13. In effect, the chancellor found that the testimony of Rebecca and Jimmy Smith was contradicted by circumstances and was improbable and incomplete. We examine the reasonableness of those conclusions by reviewing the same evidence. The chancellor found that Rebecca Smith willfully, knowingly, and fraudulently concealed her receipt of approximately $5,700 *979 in distributions from a mutual fund. The chancellor specifically found that Smith's explanations were unbelievable that her brother Fred McDonald told her the mutual fund dividends were hers and that her original estate attorney, now deceased, told her that it was permissible for her to keep the funds. The chancellor found that her claim of "good faith" error was not credible. The chancellor also noted that Smith did not include the receipt of these dividends in her final accounting which was submitted pursuant to a court order.
¶ 14. The chancellor found that Smith converted $13,500 in United States savings bonds and concealed from the heirs of the estate the previous existence of those bonds. The final accounting, submitted after two chancery court orders, asserted that the McDonald estate was the owner of only $2,000 in U.S. savings bonds. Rebecca Smith could not recall why she stated that there were only $2,000 in savings bonds and could not recall the source of the $2,000 figure. She also does not recall why she transferred $2,000 from the personal checking account on December 20, 1996, to the estate account, which created a record of a deposit amount that corresponded to the erroneous figure for the bonds. December 20, 1996 was the date given in the final accounting for the redemption of the U.S. savings bonds. The bonds were actually redeemed in March 1997.
¶ 15. Rebecca Smith stated that she never looked at the bank statements relating to McDonald's personal checking account. She stated that her son looked after those records and that she never asked him what was in those statements. She also had no explanation for why $11,000 was taken out of the personal checking account in little over a week. Jimmy Smith testified that he never looked at the statements for the personal account. He testified that the statements were never opened and were promptly thrown away. They were not kept because McDonald's will waived an accounting and because "you just have so much room to keep things."
¶ 16. The chancellor noted that Rebecca and Jimmy Smith gave differing explanations for Jimmy's writing of checks from the estate account. Rebecca Smith asserted that her son wrote checks as a "convenience" to her. She also asserted in her deposition that any money that Jimmy Smith received by writing checks from the estate account were distributions for his share of the estate, although at trial she did not remember making such a statement. She also asserted at trial that all checks paid to the order of cash were for her living expenses. Jimmy Smith also claimed that any amounts he may have received by writing checks were for services that he rendered to Fred McDonald over a period of fifteen to eighteen years. An itemization of those services was introduced at trial. Jimmy Smith estimated that he rendered services to McDonald worth approximately $26,000.
¶ 17. Although no witness directly contradicted the testimony of Rebecca and Jimmy Smith either as to their motives or about explanations for their actions, the circumstances in this case are such that the credibility of the testimony is lacking. There was adequate evidence to permit the inference of conscious concealment of estate assets in order to defraud the heirs of the estate. We find no error in the chancellor's finding on these points.
¶ 18. Next, the Smiths argue that the chancellor erred in not holding a separate hearing for determining punitive damages and that the chancellor's award of punitive damages was arbitrary. After an award of compensatory damages has been made by the trier of fact, an evidentiary *980 hearing before the same trier of fact is promptly to be held on the issue of punitive damages. Miss.Code Ann. § 11-1-65(1)(c) (Supp.2001). As this was a chancery court proceeding, the trial judge is the trier of fact and the need for a separate hearing is lessened. Neither party asked for an additional hearing. The chancellor both before the start of trial and at its conclusion stated that he would ask the parties to present within fifteen days after trial proposed findings of fact and conclusions of law on all issues, which would include actual and punitive damages. This meant that there would be one trial, not two. We find no error on this record in failing to conduct a separate hearing.
¶ 19. The Code also requires the trier of fact to "consider, to the extent relevant," certain factors. Miss.Code Ann. § 11-1-65(1)(e) (Supp.2001). Among those factors are financial net worth, the seriousness of the defendant's conduct, the relationship between the defendant and plaintiff, the period over which the conduct occurred, and any attempt at concealment. Id. By its own terms, the statute does not require that all listed factors be considered, and factors not listed in the statute may be considered. Only relevant factors need be considered.
¶ 20. In a case decided before the adoption of Section 11-1-65 in 1993, the Supreme Court held that evidence of the defendant's net worth is not a prerequisite for an award of punitive damages. C & C Trucking Co. v. Smith, 612 So.2d 1092, 1105 (Miss.1992). It would appear that the legislature at the first session after C & C Trucking attempted to guide the introduction of proof of net worth. The statute only required that net worth be considered if relevant. Indeed, that was the approach of C & C Trucking as it structured when proof of net worth is relevant. Proof of net worth is relevant when one wishes to complain on appeal that a punitive damages award is either too high or too low. C & C Trucking, 612 So.2d at 1105. In this case, the relatively small amount of punitive damages in comparison to the actual damages makes net worth largely irrelevant.
¶ 21. The record reveals that as executrix Rebecca Smith converted estate funds for her own personal use, allowed her son Jimmy to do the same, refused to provide family members with an accounting of estate property when asked in 1997, only produced an accounting in late November of 1999 after two separate court orders, and when an accounting was produced it was incomplete and partially false. The chancery court also found that even though Rebecca and Jimmy Smith claimed to have no assets, that he could not allow that fact to prevent the imposition of punitive damages when it was apparent that they voluntarily deprived themselves of assets. The chancellor noted that the punitive damages awarded were only twenty-five percent of the compensatory damages.
¶ 22. We find the award of punitive damages in the amount of $20,000 to have been proper.

2. Fraudulent Conveyances/Constructive Trust
¶ 23. The chancellor set aside two conveyances of property from Rebecca Smith to her daughter or daughters. We will examine each in turn.

a. 500 acre farm
¶ 24. Rebecca Smith executed a warranty deed to her daughter, Cynthia Nance, conveying her 500 acre farm, reserving a life estate. The chancellor found that the purpose of the transfer was to leave Rebecca Smith without any assets. The chancellor ordered that the transfer *981 be set aside, that a constructive trust be imposed on the land, and that the land be subject to execution. The chancellor also ordered that the judgment be indexed in the land records to give notice of the trust and that the circuit clerk be provided an abstract of the judgment so that the judgment could be enrolled.
¶ 25. Rebecca Smith admits that conveyance of the 500 acres of land to her daughter was an attempt to put her assets outside the reach of her creditors. She just disputes that it was these creditors. She testified at trial that the purpose of the conveyance was to prevent the Farmer's Home Administration or Farm Services Administration from claiming the farm to satisfy a debt left by her late husband on a piece of farm equipment. She argues that the transfer cannot be set aside as a fraudulent conveyance as she did not become executrix of the estate until after the transfer had been made, the estate was not yet a creditor, and the statute of limitations prevents the chancery court from setting the transfer aside now.
¶ 26. By statute, conveyances of land made to defraud creditors may be declared void. Miss.Code Ann. § 15-3-3 (Rev.1995). Two exceptions are conveyances that are made "upon good consideration" and conveyances, although fraudulent, which are made prior to the incurring of a debt with a creditor. Miss.Code Ann. § 15-3-5 (Rev.1995). However, a conveyance, although fraudulent, and made prior to debts being incurred with subsequent creditors may be set aside if the conveyance was "with intent to defraud" those subsequent creditors. Id.
¶ 27. Rebecca Smith argues that the conveyance to her daughter cannot be set aside because at the time it was completed she had not yet been appointed executrix, the estate was not yet a creditor to which she owed a debt, and the conveyance was not intended to defraud the estate by making her judgment proof. At trial her attorney objected to questioning about the conveyance because it occurred prior to her appointment as executrix which meant the conveyance was prior to the time when she had authority to conduct business of the behalf of the estate. Smith argues that any misuse of estate funds prior to her appointment as executrix did not amount to conversion as "she had no official role to do anything."
¶ 28. Smith asserts that she only intended to put her 500 acre farm out of the reach of the FHA for fear that it might foreclose on the property. Rebecca stated at trial that she could not have any property in her name. Her daughter Cynthia testified that she was aware of why her mother conveyed the farm to her. Cynthia was later to divide the property equally with her brother Jimmy and sister Lisa.
¶ 29. There is evidence in the record from which the inference can be made that Rebecca Smith conveyed the property with intent to defraud the estate. Foremost is the fact that on the same day the warranty deed was drawn up by one attorney, Rebecca Smith also visited the estate attorney to sign the petition to probate the estate. She could offer no explanation as to why she used two different attorneys. As discussed previously, both Rebecca and Jimmy Smith had misappropriated estate funds prior to the conveyance. Rebecca Smith claimed the conveyance was to protect the property for all of her children, but she conveyed it to only one. The timing of and circumstances surrounding the conveyance permit a finding of intent to defraud. We find that the conveyance complained of here can be properly set aside as being fraudulent as to the estate.
*982 ¶ 30. There is also an issue of whether the authority of the chancery court to set aside the conveyance had been ended by a statute of limitation. The conveyance was completed in November 1995. The complaint seeking to set aside the conveyance was not filed until December 1999. Smith argues that the general three-year statute of limitations should apply. The estate contends that the three-year statute of limitation was tolled due to Smith's concealment of her fraud against the estate.
¶ 31. Rebecca Smith cites one case in primary support of her argument. O'Neal Steel, Inc. v. Millette, 797 So.2d 869 (Miss. 2001). In that case, O'Neal Steel won a judgment in Alabama against Terrence John Millette and Theodore J. Millette, both Mississippi residents. O'Neal Steel, 797 So.2d at 871. The date of the final judgment is unstated, but the Court referred to the 1992 Alabama decision that reversed the initial judgment on a procedural defect and remanded. Id. at 871, citing Millette v. O'Neal Steel, Inc., 613 So.2d 1225 (Ala.1992).
¶ 32. In 1993, which was after the initial judgment, after the remand by the Alabama Supreme Court, and either after the new trial court judgment or at least with the knowledge that an award might be made, Theodore Millette conveyed property to his son. Id. O'Neal Steel enrolled its new judgment in 1994 in Mississippi but did not seek to set aside the conveyance as being fraudulent until 1998. The Mississippi Supreme Court found that the general three-year statute of limitations would apply to a cause of action seeking to set aside a fraudulent conveyance. Id. at 875.
¶ 33. The creditor argued that concealed fraud would cause the statute of limitations to be tolled. The concealment was that Millette committed perjury at a judgment debtor examination about its assets. The Mississippi Supreme Court disagreed that such perjury would toll the statute of limitations as to this real property conveyance. A "creditor seeking to assert the tolling of the statute of limitations on the grounds of concealed fraud [must] show that he or she has been diligent in his or her search in such matters." Id. This would have required O'Neal Steel to examine "the land records ... where the judgment debtor resides." Millette, 797 So.2d at 875. The Court further stated that "where an alleged fraudulent conveyance of real property is recorded and available to the public, there can be no concealed fraud preventing the running of the statute of limitations." Id.
¶ 34. The difference here is that the heirs of the McDonald estate had no reason to know in 1995 when Rebecca Smith executed this deed of land that she was in other ways misappropriating estate assets. Quite differently, in 1993 O'Neal Steel already was claiming that the Millettes were liable to it and had already received one judgment so holding. The heirs of Fred McDonald were not put on notice by the recorded deed to this property that Smith, which was not an estate asset, was using money that should have been deposited into estate accounts for personal use. It is that hidden activity that constituted the concealed fraud and which tolled the statute of limitations on setting aside the unconcealed conveyance for which there was no basis to believe at that time was made in order to defraud the heirs.
¶ 35. Rebecca Smith successfully concealed her fraud from October 1995 until November 1999 when her final accounting, which was false, was filed. Smith's concealed fraud tolled the running of the general three year statute of limitations that applies to fraudulent conveyances. The chancellor did not err in setting aside the conveyance.
*983 ¶ 36. The chancellor also placed the land in a constructive trust.
"A constructive trust is one that arises by operation of law against one who, by fraud, actual or constructive, by duress or abuse of confidence, by commission of wrong, or by any form of unconscionable conduct, artifice, concealment, or questionable means, or who in any way against equity and good conscience, either has obtained or holds the legal right to property which he ought not, in equity and good conscience, hold and enjoy." Alvarez v. Coleman, 642 So.2d 361, 367 (Miss.1994).
That is not really the issue here. The land was conveyed by Rebecca Smith. Those receiving the benefit of the trust are not alleging that they in equity and good conscience should have title; they are arguing that equity and good conscience requires that Smith have title in order to satisfy their judgment.
¶ 37. The constructive trust here reinforces the judgment lien also imposed on the property by the chancellor. Whether this was a proper use of the constructive trust doctrine is irrelevant on this appeal, as setting aside the conveyance and applying the lien provides the same protection. We therefore reach no conclusion as to the propriety of a constructive trust.

b. Distributions
¶ 38. The chancellor set aside as fraudulent the transfers of cash and stock from Rebecca Smith to her two daughters, Cynthia and Lisa. The chancellor also placed the cash and stock in a constructive trust. Rebecca Smith disclaimed her interest in the McDonald estate and directed that her interest be divided evenly among her two daughters. The estate argues that the disclaimer was invalid. As executrix, Smith made a partial distribution of cash and stock to all the heirs of the estate. Cynthia and Lisa each received $6,000 in cash and 144 shares of Union Planters stock. Both daughters promptly gave the cash and stock to their mother. What was done with the cash is unknown, but the stock was sold and the proceeds, approximately $9,500, was applied against the loan outstanding against Smith's 500 acre farm.
¶ 39. The daughters gave the cash and stock back to their mother. The stock was sold to unnamed individuals not made parties to the present suit. Union Planters Bank stock is traded on the New York Stock Exchange. Some of the funds were used to reduce the balance on the loan on the 500 acre farm, thereby increasing the equity in the property that Rebecca Smith has had returned to her. There is no transfer that can be set aside. The real claim by these now-judgment creditors is to assets presently being held by Smith, including the land returned to her as a result of the chancellor's orders. There is no stock. The appellees have a lien against Smith's interest in the farm. The validity of the disclaimer, the setting aside of the transfers from mother to daughters, and imposition of a constructive trust are moot points.

3. Attorney's Fees
¶ 40. Smith's counsel argues that he should be granted attorney's fees for the services he rendered on behalf of the executrix and for services that benefitted the estate. This is because "the bulk of the information" used at trial was provided by his office. He also argues that the chancellor penalized him for Rebecca Smith's actions prior to his representation of the estate.
¶ 41. Smith's counsel also argues that the chancellor should not have awarded the estate's and heirs' counsels attorney's fees. The final judgment indicates that *984 Rebecca and Jimmy Smith were ordered to pay the attorney's fees, not the estate.
¶ 42. Attorney's fees may be awarded where an award of punitive damages is made. Dunn v. Dunn, 786 So.2d 1045, 1055 (Miss.2001). An award of attorney's fees is proper in this case. An award of attorney's fees for the Smiths' counsel is not warranted because his services benefitted not the estate but the former executrix and her children as individuals and not as heirs of the McDonald estate. Ruffin v. Burkhalter, 238 Miss. 358, 365-66, 118 So.2d 357, 360 (1960).
¶ 43. THE JUDGMENT OF THE CHANCERY COURT OF BENTON COUNTY IS AFFIRMED. STATUTORY DAMAGES AND INTEREST ARE AWARDED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANTS.
KING, P.J., BRIDGES, THOMAS, LEE, MYERS, CHANDLER and BRANTLEY, JJ., concur. McMILLIN, C.J., and IRVING, J., not participating.